Carter *v*. Carter.

GEORGE F. CARTER, trustee for Frank E. Carter and James
B. Carter, infants,

*v.*

MAY L. K. CARTER et al.

[Filed September 26th, 1902.]

1. A husband purchased land, on which there was a mortgage, by paying the mortgagee the amount of the mortgage, and the balance of the price to the grantor, and by taking a deed in his wife's name, intending it as a gift to her. The mortgagee executed a satisfaction of the mortgage and delivered it to the husband. On the same day the husband and wife decided to make a gift of the mortgage to their children, and thereafter the mortgagee made an assignment of the mortgage to the husband, as trustee thereof, in favor of the children, accepting the money already paid on the mortgage as payment for the assignment. Several months thereafter the assignment was recorded.—*Held*, that a valid voluntary trust of the mortgage in favor of the children was created, the wife, in effect, refusing to accept the entire gift and thereby constituting the husband, in equity, the owner of the mortgage, so that his acceptance of the assignment of the mortgage, as trustee, constituted a declaration of the trust.

2. Where, in a suit to foreclose a mortgage by a trustee under an assignment thereof, the judgment creditors of the owner of the equity in the land intervened and pleaded that the assignment of the mortgage was fraudulent as against them as creditors of the owner, such creditors could not amend by also alleging that the assignment was fraudulent as against them as creditors of the trustee, the proposed amendment constituting a distinct cause of action.

3. The assignment of the mortgage was not fraudulent as against the creditors of the wife, the assignment being a conveyance of the husband's property which the wife had declined to accept as a gift.

4. Though the assignment should be considered as a donation by the wife of her own property, it would not be fraudulent as against her creditors where, at the time of the assignment, she owed no debts nor contemplated owing any.

5. The division of the gift so as to give the equity in the land to the wife and the mortgage to the children was not as if the wife placed part of her property beyond the reach of her creditors, and therefore fraudulent as against them, but was as if the husband refrained from giving all the property to the wife, and gave part of it to his children, so as to avoid the possibility that creditors of the wife might absorb the whole of it.

6. The cancellation of a mortgage by a trustee, under an assignment thereof, for the purpose of increasing the property of the party chargeable with the payment thereof so as to obtain a further credit for such, party, with the knowledge of the creditors, is illegal.

7. In a suit to foreclose a mortgage by a trustee, under an assignment thereof, the judgment creditors of the owner of the equity in the land pleaded that the trustee, on a designated date, had represented that the mortgage was paid and had offered to cancel it, and that, thereupon, they extended further credit to such owner, and in consequence suffered loss. The evidence showed that the trustee endeavored to explain the transaction to the creditors, and produced the uncanceled mortgage and assignment. The creditors knew that the owner of the equity was insolvent and made no inquiry as to the time or manner of payment of the mortgage. The mortgage was left with the creditors for cancellation, if necessary, to protect them.  On cross-examination the trustee admitted that he had informed the creditors that the mortgage had been paid. The creditors testified that, if the mortgage had not been delivered to them, the account against the owner might have been closed up immediately. There was no testimony as to the amount of the loss sustained by the creditors due to the extension of the credit to the owner of the equity.—*Held*, that the evidence was insufficient to establish an estoppel for the benefit of the creditors so as to make their subsequent judgment prior to the mortgage.

On final hearing on bill, answer and proofs.

The complainant, George F. Carter, as trustee for his two infant children, claims to hold a mortgage upon a house and lot in Fanwood, Union county, New Jersey, belonging to his wife, in which the complainant and his wife and these children reside, and he files his bill in this cause to foreclose the same.

The controversy is wholly between the complainant and the defendants William H. Rolston, Walter A. Bass and Edward S. Hooley, composing the firm of Rolston & Bass, stock brokers, of New York City.  These defendants, after the filing of the bill, recovered a judgment against Mrs. Carter and levied the same upon the mortgaged premises.  Being admitted as parties defendant, they filed an answer and cross-bill, seeking to have the mortgage of the complainant declared inoperative as to them and to have the same canceled of record, to the end that their judgment may be a lien upon the whole property, instead of the equity of redemption only, the latter being manifestly insufficient in value to pay the same.  The two infants are made defendants, and guardians have been duly appointed.  The com-

plainant is seeking to enforce solely the rights of these infant children. All the parties are before the court, and no objection is made to the form of the proceedings. The single question in the cause is whether the mortgage of the infants is a valid encumbrance as against the judgment of the defendants Rolston & Bass upon the real estate in question owned by the defendant Mrs. Carter.

For a long time prior to February 21st, 1899, George F. Carter was a dealer in stocks, in the usual way, with Messrs. Rolston & Bass. His speculations had been successful. In February, 1899, he drew out of his profits about $4,800 for the purpose of buying a house for his wife, which purpose he casually mentioned to his brokers, with whom he had somewhat intimate personal relations.

The gift of the house was effected on February 21st, 1899. After this date Mr. Carter's account with Messrs. Rolston & Bass was continued, and, for two or three months, to his substantial advantage. He drew out various sums of money, and on April 3d drew, in one sum, $4,010, and he swears that about that time he considered that he had a surplus in his account of probably $20,000.

The relation of the market value of the stocks and other securities held by Messrs. Rolston & Bass, in February and March, 1899, to the account for which they were pledged, appears to have been such that the indebtedness of Mr. Carter to the brokers was amply secured. It was shown that the market price of these stocks, at the dates under consideration, was greater than the indebtedness by about $3,000. It was also shown that subsequently these securities were sold at a price, in the aggregate, exceeding the indebtedness. The defendants made no effort to meet this proof, but contented themselves with showing that the account was an open, running account, and was continued by the purchase and sale of securities, and finally was closed out in May, 1900—a year later—at a loss, leaving Mr. Carter in debt to the brokers.

Mr. Carter selected for his gift to his wife the house and lot in Fanwood, above mentioned, which she now owns, and upon which he now claims to hold the mortgage sought to be fore-

closed in this suit. At that time the house and lot were owned by Mrs. Leona Pentz, while the mortgage was held by Miss Jane Man. The mortgage was a purchase-money mortgage, upon which there was due $3,000 of principal.

Mr. Carter, in pursuance of the purpose which he had formed, and in a friendly way had communicated to his brokers, at first undertook to vest the property as a gift in his wife free and clear of encumbrance. Accordingly, on February 21st, 1899, Mr. Carter, Mr. Pentz, as the representative of his wife, and Miss Jane Man met at the office, in New York City, of Mr. George Kyte, now deceased. Mr. Kyte was an intimate friend of Mr. Carter, and Mr. Carter relied upon him to see that the business was done correctly. Mr. Pentz was accompanied by counsel. The entire purchase-price agreed upon was $4,800, of which $100 had been paid by Mr. Carter to Mr. Pentz some weeks before. The balance of the consideration—$4,700—was accordingly, on February 21st, 1899, paid by Mr. Carter, as follows: $1,700 by check for that amount, endorsed by Mr. Carter so as to be payable to the order of Mrs. Pentz, and $3,000, by similar endorsement of Mr. Carter, to Miss Jane Man.

Mr. Pentz delivered to Mr. Carter a warranty deed of the property, which recites a consideration of $5,500 in cash, and also recites that the property was thereby conveyed subject to a mortgage for $3,000.

Miss Man delivered up the mortgage, which she had brought with her, together with a warrant for the satisfaction of the same, executed and acknowledged by her in the usual form.

Miss Man naturally would have brought the bond of Mr. and Mrs. Pentz, which it is proved she received when she purchased the mortgage. Mr. Carter testifies that he has searched for the bond and cannot find it, but he is "quite certain" that this bond accompanied the assignment which was subsequently made to him. He may mean to testify that he is quite certain that the bond was produced by Miss Man with the mortgage. Neither Mrs. Pentz nor her husband, who were the obligors named in the bond, nor the attorney who accompanied the husband, apparently charged with the duty of seeing that his interests were protected in the transaction, was produced as a witness. The

bond being traced down to the date of the surrender of the mortgage, I think the inference, in the present condition of the proofs, is unavoidable that Mr. Pentz or his attorney took possession of this retired obligation. Mr. Carter had no right to this bond, which he had just paid off, nor would he or Mr. Kyte have cared to take possession of it. But Mr. Pentz or his attorney would, as a matter of course, desire to hold the surrendered bond as evidence of the payment of the debt which it had represented, at least as long as the evidence of such payment from the cancellation of the mortgage depended upon Mr. Carter's recording and paying for the record of the warrant.

The parties separated, but later in the day, before Mr. Carter could even report the transaction to his wife, or record the deed, or secure the cancellation of record of the mortgage, Mr. Kyte suggested that Mr. Carter's gift to his wife of $4,800 worth of property might more wisely be divided between the wife and the two infant children, so as to give the wife equity worth $1,800 and give the children the mortgage interest, worth $3,000. This plan was immediately reported to Mrs. Carter, and she gave her assent to it. The carrying out of the plan was entrusted to Mr. Kyte, who procured an assignment, in the usual form, of the bond, as well as the mortgage in question, from Miss Man to "George F. Carter, trustee for Frank E. Carter and James B. Carter." The assignment contained a covenant, in the usual form, on the part of Miss Man, that there was due and owing on the bond and mortgage the sum of $3,000 and interest thereon from February 21st, 1899. Miss Man agreed, in effect, that the $3,000 which she had received from Mr. Carter should be deemed the price of an assignment of the mortgage and the mortgage debt from her to him, as trustee for the two infants, instead of the payment of the mortgage debt. She probably did not think to inquire into the whereabouts of the bond, or she assumed that the bond had gone, along with the mortgage, into the possession of Mr. Carter. All the parties to the original transaction, with the exception of Mr. and Mrs. Pentz, the makers of the bond, agreed upon a sort of novation of the various relations between them established by the transactions of February 21st.

The assignment of the bond and mortgage to the complainant

was acknowledged by Miss Man on March 10th, but there is nothing to show that there was any change of condition on the part of anyone during the three weeks it took Mr. Kyte to procure the assignment from Miss Man. The deed to Mrs. Carter, reciting the existence of the mortgage for $3,000, was promptly recorded on February 23d, 1899. The assignment from Miss Man to Mr. Carter, as trustee, while delivered in March, 1899, was not placed on record until October 3d, 1899. The delay, however, in recording this assignment is shown to have been a pure accident. There is not a suggestion of any fraudulent purpose—of any intentional concealment of the existence of the assignment from anyone.

On April 13th, a month after Miss Man had executed and acknowledged the assignment to Mr. Carter, as trustee, Mr. Carter opened a speculative account with Messrs. Rolston & Bass in the name of his wife.. He took $2,000 of the profits which he had drawn about a week before from his own account, as we have seen, and deposited it with the brokers, in order to open a similar account with his wife. The evidence of Mr. Carter indicates that his project of transferring a part of his speculative business to his wife was formed by him within a few days before he carried it out—after April 3d, 1899, when he drew $4,010 on his own account and purchased certain securities. However this may be, there is no evidence to suggest that, on February 21st, or at any time until after March 10th, 1899, any of the parties interested contemplated that Mrs. Carter would open an account with Messrs. Rolston & Bass or in any way become indebted to them. The $2,000 in securities which Mr. Carter deposited with Messrs. Rolston & Bass, as the basis of the account which they opened with Mrs. Carter, appears to have been a clear gift from husband to wife. The profits from the dealings on the new account went to the wife. The loss on the account, which was determined a year later, when the account was closed, remained charged wholly against the wife, and for it Messrs. Rolston & Bass sued the wife and recovered the judgment above mentioned against her, upon which their whole case is based.

For a short time after the opening of the account with Mrs.

Carter that account, as well as Mr. Carter's account, remained active and, to a certain extent, profitable, but before many months the accounts became doubtful; no further purchases were made, and, in the light of the then market value of the securities held by the brokers, a loss in each case became probable. Still, as in all such cases, an element of uncertainty remained. A rise in stock values would have enabled both accounts to be closed out with a profit to the dealer.

By January, 1900, these accounts had apparently become hopelessly bad, as brokers' accounts generally do when interest is running; no new deals are made, and the securities are not improving in market value. About this time Mr. Hooley, one of the members of this firm of brokers, saw, in an old newspaper, what appears to have been a report of the recording of the assignment to Mr. Carter, as trustee, which was done on October 3d, 1899, as stated above. This witness testified that he learned from the newspaper "that a mortgage had been put on a piece of property of George F. Carter in some way," and that this information worried and bothered him. He says that he sent for Mr. Carter, in order to get an explanation, and Mr. Carter started to explain, although he (the witness) was excited and cannot recollect exactly in regard to the matter, and does not undertake to state what Mr. Carter said. Mr. Carter testifies that Mr. Hooley said, "In the state of your wife's account, that won't stand for five minutes," and Mr. Hooley testifies that he said, "George, don't take any more away from us; it is bad enough as it is," or something of that kind.

There is no substantial inconsistency between the testimony of Mr. Carter and Mr. Hooley as to this interview, which took place January 10th, 1900. Mr. Carter, however, narrates, with apparent accuracy of memory, a number of important statements made at this interview, which Mr. Hooley does not disprove in the meagre testimony which he gives in regard to the matter.

Mr. Carter says that he endeavored to explain just how the "transaction came about;" that the assignment was not a recent affair, as Mr. Hooley had evidently supposed, but had been made nearly a year before; that while he had, at first, intended to

give the property to his wife free and clear, he had changed his mind, and given the mortgage to his children. This offered information, Mr. Hooley, in his excitement, seemed not to take in or not to believe. Mr. Hooley apparently asked no questions and made no investigation as to the rights of the children. Mr. Carter protested that he had been "square," and left with the assurance that he would do what he could to right matters, if he had not done what was right.

The next day—January 11th, 1899—Mr. Carter brought the mortgage and assignment to Mr. Hooley and showed him the dates, in order to prove to him his statements made the day before in regard to the transaction were correct, to the effect that the assignment had been made in March, 1899, and that "it was not a fresh transaction," and that he (Mr. Carter) "certainly did not put it on record with the intention of defrauding Messrs. Rolston & Bass."

The result of this interview of January 11th, 1900, was that Mr. Carter, in Mr. Hooley's presence, wrote and signed a receipt for cancellation, in the usual form, upon the back of the mortgage, and also upon the back of the assignment, and delivered the papers to Mr. Hooley, it being understood that they should be kept in the safe of Messrs. Rolston & Bass. No arrangement was made for having the mortgage canceled of record, and the evidence strongly indicates that it was understood between Mr. Carter and Mr. Hooley that Messrs. Rolston & Bass were to hold the mortgage, with the receipt upon it, which would permit of its cancellation at any time, for their protection solely.

In the spring of 1900, when the probability that Messrs. Rolston & Bass would have a substantial claim against Mrs. Carter, upon the closing out of her account, became practically a certainty, and the *status* of the trust for the benefit of the children naturally called for attention, Mr. Carter took the advice of counsel, who advised him that he had no right to cancel the mortgage. He accordingly notified the county clerk not to cancel the mortgage, except when it was presented by himself. A little later Mr. Carter, as trustee, filed this bill to foreclose

his mortgage, and Messrs. Rolston & Bass, having obtained a judgment against Mrs. Carter, were admitted as parties defendant, as above stated.

*Mr. Edward A. S. Man,* for the complainant.

*Mr. Edward Q. Keasbey,* and *Mr. Norbert Heinsheimer* (of the New York bar), for the defendants.

STEVENSON, V. C.

The first question to be determined is whether these infants have an encumbrance to the extent of $3,000 upon the property described in the bill of complaint, now owned by their mother, Mrs. Carter, which is a valid encumbrance as against her.

If the assignment made by Miss Man to Mr. Carter, on March 10th, in which Mr. Carter is described as trustee for the two infants, could operate as a transfer to him of the property which it purported to convey, I think it is clear that a valid trust was created for the benefit of these infants. The settlement was voluntary, but whether it undertook to vest property which belonged to Mr. Carter or to Mrs. Carter, I do not think there can be any doubt that all parties to the transaction, including particularly Mr. and Mrs. Carter, intended, in good faith, that the assignment should operate as a conveyance of property to Mr. Carter, as trustee for the two infants. Whether, in case it was an efficient conveyance, it was void as against creditors of Mr. or Mrs. Carter, is not at present under consideration. We are dealing, in the first place, with the narrow question whether the instrument operated to create a trust valid as between the infants and the donor or donors who created the trust. I find nothing in the testimony to impeach the validity of this voluntary settlement, in the form of a trust, as between the donor or donors on the one hand and the beneficiaries on the other, provided the forms employed to accomplish the intended result, in fact, operated so as to make a transfer of the property intended to be conveyed.

There is no pretence that either Mr. or Mrs. Carter procured the assignment of this mortgage to Mr. Carter apparently in

Carter *v*. Carter.

trust to his children for any reason of convenience, similar, for instance, to those which induce savings bank depositors sometimes to open accounts nominally in their names as trustees for other persons, when, in fact, no trust is intended, and the beneficial, as well as the legal, interest in the account is intended to be retained. The mere fact that Mr. Carter retained the power to commit a breach of his trust, by collecting the money and appropriating the same to his own use, does not affect the fact that, as between himself and his children, the trust was absolutely established.

The donative purpose on the part of both Mr. and Mrs. Carter, in endeavoring to transfer this mortgage to their two children, is proved beyond doubt. The instrument declares the trust and is, in form, a legal conveyance. It created a valid trust if the property which it described, in fact, existed. *Viney* v. *Abbott, 109 Mass. 300; Green* v. *Tulane, 7 Dick. Ch. Rep. 169, 171; Dunn* v. *Houghton, 51 Atl. Rep. 71,* and cases cited.

Our first inquiry, therefore, is reduced to this—whether the assignment from Miss Man to the complainant, as trustee, operated as a legal conveyance of the mortgage interest which it purported to convey.

It is plain that the settlement which Mr. or Mrs. Carter, or both of them, endeavored to make for the benefit of their children was a voluntary settlement. The general rule is well settled that a gift, to be operative, must be completed; the donative purpose, however, fully expressed, is insufficient. Two main elements enter into every such donation as the one now under consideration, viz., (1) the donative purpose—*i. e.,* the intention to effect a transfer of property to the donee for his use and benefit, and (2) the use of means recognized by the law as efficient for the accomplishment of this donative purpose. It is a general rule that equity will not aid in carrying out an incomplete gift. Until the donor has actually effected his gift, he may change his mind. How far an uncompleted gift is enforceable after the death of the donor, as a *quasi* contract, where the donative purpose was not charged and the object of the donation is the support of children, need not be discussed in this case. See *Landon* v. *Hutton, 5 Dick. Ch. Rep. 500.*

All the parties to the attempted voluntary settlement are alive and before the court in this cause. The point, therefore, to be determined is simply whether, with this distinct donative purpose on the part of Mr. and Mrs. Carter, they used means which the law recognized as efficient to execute that donative purpose. If they did, then we must go further, and inquire whether this donation is also valid as against these judgment creditors, Messrs. Rolston & Bass.

A correct analysis of the situation, I think, will make it appear that the legal efficiency of this instrument of assignment to effect a voluntary transfer of property must be viewed very differently, according as we deem Mr. Carter or Mrs. Carter to have been the donor. If Mr. Carter was the donor, the mortgage, at the time of the settlement, represented an outstanding valid encumbrance upon Mrs. Carter's land, and was owned by him in equity, and could be conveyed, under his direction, by such an assignment as Miss Man executed.

If Mrs. Carter was the donor, there was no mortgage in existence for her to transfer, or procure to be transferred by Miss Man; it was necessary that Mrs. Carter should create, or cause to be created or recreated, an interest, to the extent of $3,000, in the lands which she then owned free and clear of any mortgage debt, and cause such interest to be vested in Mr. Carter, as trustee, by virtue of the assignment from Miss Man.

If Mrs. Carter was the donor, the donation consisted in what has been called the "revival" of a mortgage. The mortgage so supposed to have been revived was one to which Mrs. Carter was never a party and which she had never assumed; the debt secured by it had been knowingly paid, without any feature of fraud or mistake, and the bond, which the mortgage was given to secure, not only had been discharged, but remained discharged, and is not supposed to have been revived. Mrs. Carter no doubt could enter into a valid *contract* subjecting her land to an encumbrance equal to, and defined by, any prior encumbrance thereon. How she could make a *gift,* by procuring the former holder of this paid mortgage to execute an assignment of the same to the donee, is difficult to perceive.

Whether Mrs. Carter may be charged with representations

to Miss Man upon which she (Miss Man) assigned the mortgage and covenanted in her assignment that $3,000 and interest were due thereon, and whether any estoppel against Mrs. Carter, and ultimately in favor of these children, would arise from those facts, might be a question if all the evidence which plainly would throw light upon the subject has been produced.

But I do not think it is necessary to decide the question whether, in case Mrs. Carter must be regarded as the intending donor, she succeeded in effecting a legal donation, in trust for her children, of an interest in her land to the extent of $3,000, because the testimony satisfies me that Mrs. Carter was not the donor, intending or actual, inasmuch as she never was the owner of the subject-matter of the gift; that this whole voluntary settlement for the benefit of these children was the gift of their father, the complainant, and consisted of a transfer of property which belonged to him in equity and which he controlled.

I do not find, from the evidence, that the mortgage which Miss Man held for $3,000 was ever paid so as to extinguish it. The amount undoubtedly was paid, but by a person who was not bound to pay it—by a stranger acting solely with intent to make a donation to the person who was, as he thought, about to acquire the land upon which the mortgage was an encumbrance. Mr. Carter bought the land and undertook to discharge the mortgage as one transaction. He procured a deed from Mrs. Pentz to his wife; he procured the mortgage, with a warrant for its satisfaction, from Miss Man, and paid to each of these parties a full consideration. He undoubtedly assumed that his wife would accept the gift or gifts which he was putting himself in a position to make to her. Mrs. Carter could accept the papers and thus ratify the acts of her husband, and such ratification would, according to the familiar principle, relate to the date of the delivery of the papers to Mr. Carter. But there is no contract of agency proved in this case which binds Mrs. Carter by the acts of her husband in receiving this deed from Mrs. Pentz and paying the $3,000 to Miss Man and accepting a discharge of the mortgage.

Moreover, inasmuch as we are dealing with a pure gift, it would seem that Mr. Carter, before delivering the papers to his

wife or reporting the transaction to her, before his wife could, in any way, ratify what he had done, had the right to procure the other two parties to unite with him in undoing all that had been done, by exchanging back the things which they. severally had received from each other. But whether there was this *locus penitentiae* for Mr. Carter or not—assuming that he had completed the necessary legal form of a gift, on his part, by what was, or took the place of, a delivery—still the gift was incomplete, because it was not accepted. Mrs. Carter not only did not accept, but she expressly rejected the offered gift, and so threw it back upon her husband's hands.

To constitute a valid gift, there must be the assent of both parties. *14 Am. & Eng. Encycl. L. (2d ed.) 1027* and cases cited in *note 3.*

The necessary acceptance—*i. e.,* the reception of the thing offered, with assent to the donative purpose of the donor—may often be presumed, but such a presumption is founded, not only on the beneficial character of the gift, but also on either the absence of dissent to the gift or the presence of incapacity to assent or dissent. The proposed donee in this case was *sui juris,* and, in the exercise of her liberty, saw fit to decline the offered donation. She refused to accept both the deed and the discharge of the mortgage, and the donor and donee agreed that the deed only should be accepted.

The result was that, under a familiar equitable principle, often applied where encumbrances are paid by mistake, the party so paying, who has been disappointed in his expectation under which he paid, is subrogated to the holder of the encumbrance, and holds the same for his own protection.

The fact that the bond of Mr. and Mrs. Pentz had been discharged is a matter, it seems to me, of no consequence, further than this, that they might justly claim that Mr. Carter, after paying out his money knowingly and intentionally for the discharge of the mortgage debt, could not reinstate that debt, as against them, so as to hold them secondarily liable for the same, merely because he had been disappointed in regard to the subsequent conduct of his wife, or had changed his own mind in regard to what he wanted to do in respect of the mortgage. Mr.

Carter might be held, as against the Pentzs, to have taken the risk of his donative purpose not being carried out as he then intended. But, however that may be, upon the plainest and simplest principles of equity applicable to such cases, Mr. Carter's subrogation to the rights of Miss Man would be complete as against Mrs. Carter. Mrs. Carter, with the advice and consent of her husband, it is true, but nevertheless, in the exercise of her own rights, declined to accept the discharge of this indebtedness from her land, or, speaking more accurately, declined to accept a conveyance of the land discharged of this mortgage, and, by accepting a conveyance of the land subject to the mortgage, she made her husband, in equity, the owner of the mortgage lien, the amount of which he had paid to Miss Man.

It follows, I think, that when Mr. Carter and Mrs. Carter united, through the agency of Mr. Kyte, in procuring a transfer of the mortgage, as an existing encumbrance, to a trustee for the benefit of these infant children, the thing that was done, in effect, was a voluntary settlement, in trust, of an existing property right, an existing encumbrance which Mr. Carter had upon the land which then belonged to his wife.

While, in equity, Mr. Carter was entitled to be subrogated to Miss Man as holder of the mortgage, his legal title required an assignment from her. When he accepted the assignment, with a covenant of the amount due to himself, as trustee for the two infants—an assignment under seal, intended to be recorded, and which was afterwards placed on record—the declaration of the trust was complete.

The second question to be determined is whether, notwithstanding that this mortgage encumbrance of the infants is valid as against Mrs. Carter, it must be held fraudulent or void as against the judgment of Messrs. Rolston & Bass.

Although the answer and cross-bill of Messrs. Rolston & Bass do not charge that the assignment was made with intent to defraud existing or future creditors of Mr. Carter, that point was strongly urged in the argument. The evidence, in my opinion, not only fails to prove any such charge of fraud, but seems almost to disprove it. But if, upon any theory, this transfer could be held fraudulent as against Mr. Carter's creditors, no

Carter *v.* Carter.

advantage of that fact could be taken in this suit. These defendants appear as creditors of Mrs. Carter, with a judgment which they hold against her property. If the assignment was fraudulent as to Mr. Carter's creditors, so also was the conveyance of the land to Mrs. Carter. The complaint of these judgment creditors is not that Mr. Carter stripped himself of his property, by a voluntary conveyance, and so rendered any claim of theirs against him of less value. Their complaint is that he did not make a larger voluntary conveyance to his wife, so that they, as her creditors, might be more beneficial than they were by the smaller gift, which they do not wish to disturb. ·

The application made at the argument for leave to amend the cross-bill so as to set up a judgment recovered by the defendants against Mr. Carter, and allege that the assignment was void as to his creditors, comes too late, and would apparently involve the trial, not of alternative, but inconsistent claims. The bill would be made to join two distinct causes of action—a proceeding to collect a judgment against Mrs. Carter out of her property, and a proceeding to collect a judgment against Mr. Carter out of his property. The two proceedings would seem to be based on contradictory theories of the ownership of the property in dispute.

If Messrs. Rolston & Bass have a judgment against Mr. Carter, they must pursue any remedies which they may have to collect it in a separate suit.

The charge that the assignment to these children was fraudulent as to these defendants, as creditors of Mrs. Carter, is equally without merit. This charge is disposed of by the proposition that the assignment was not a conveyance of any property of Mrs. Carter's; it was a transfer of Mr. Carter's property, which Mrs. Carter had declined to receive as a gift.

If, however, we must treat Mrs. Carter as the owner of property in February and March, 1899, and this assignment of the mortgage as a voluntary transfer of an interest in her property to her children, I see no proof of actual or constructive fraud in the transaction. Mrs. Carter was acquiring property, by gift, of substantial value. She owed no debts, and did not contemplate owing any debts. No reason is suggested, if this assign-

Carter *v.* Carter.

ment is to be treated as her donation, why she had not a perfect right to make it for the benefit of her children as against all the world. The fact that, weeks later, her husband saw fit to take more of his profits from his business and start her in a speculative business, which finally resulted in this indebtedness to these defendants and the judgment which they hold, cannot, in any way, color the donation which she made.

It was also argued that the evidence showed that Mr. Carter secured the division of his gift, refrained from canceling the mortgage for the benefit of his wife, and procured the assignment of that mortgage to his infant children, for the purpose of "protecting the title," or "protecting the property," and that this fact, in some way, made the withholding of the benefaction from Mrs. Carter fraudulent as against her creditors. But Mr. Carter had a perfect right, when he gave his wife the equity in the land, to give his children the mortgage, so as to prevent this mortgage interest from being subject to transfer by Mrs. Carter in any way, or subject to claims of any creditors which she might afterwards have. For a man to give a part of his property so as to put it beyond the reach of his present or contemplated creditors, is one thing; for a man to refrain from giving property to one man, and instead thereof to give it to another, so as to avoid the possibility that the creditors of the former may absorb it, is a very different thing.

There is one more claim of Messrs. Rolston & Bass which is set up distinctly in the answer, is supported by some evidence and calls for some consideration.

This claim, as pleaded, is that Mr. Carter, for the purpose of obtaining further credit to his wife, represented to the defendants that his wife was the owner of the premises in question free of encumbrance, and that, on January 11th, 1900, he produced the mortgage, assured the defendants that it had been paid, and wrote a certificate of cancellation upon it and delivered it, so endorsed for cancellation, to the defendants, and that thereupon they extended further credit to Mrs. Carter, upon the faith of the assurance of Mrs. Carter that the premises were free of encumbrance and that the mortgage had been sat-

isfied, and further, upon the faith of the endorsement of the receipt on the mortgage.

It is hardly necessary to deal with the charge of fraud in any representation that Mr. Carter made to the effect that the property was unencumbered. The proofs show that the only foundation for this charge is that the defendants knew of Mr. Carter's purpose to make a gift of the house free and clear, and undoubtedly supposed that that purpose had been carried out exactly as intended. Mr. Carter never, at any time, made any statements in regard to this matter as the basis of any credit. The defendants merely found themselves, in January, 1900, in this position: that they had given credit, or were maintaining a credit to a person who, they then discovered, had not received, by way of gift, certain property which they understood, long before the account was opened, some one had intended to give, and which they supposed had been given. The credit originally was given to Mrs. Carter on April 13th, 1899, on the strength of $2,000 in collateral donated by Mr. Carter to his wife and deposited with the brokers as security. There is no pretence that, when the account was opened, or at any time afterwards, Messrs. Rolston & Bass made any inquiry, either of Mr. Carter or Mrs. Carter, in regard to her property. If they saw fit to assume that Mr. Carter's original donative purpose had been carried out, they took the risk of being mistaken.

That the cancellation of this mortgage by Carter, the trustee, for the purpose of increasing the property of his wife, and thus obtaining a larger or further credit for her, was illegal, does not seem to require argument. Such a destruction of his trust property would be a gross breach of trust, of which the defendants certainly could not take advantage. If Mr. Carter had held $3,000 in money as trustee for his children, and had proposed to Messrs. Rolston & Bass to pay off a mortgage on his wife's land with the money, in order to enable them to give her further credit, the situation would not be materially different.

But the point which calls for consideration is this: It is charged that Mr. Carter, on January 11th, represented that the mortgage had been paid and offered to cancel it, and thereupon

Carter *v.* Carter.

the defendants took possession of the mortgage, which Mr. Carter then and there receipted for cancellation, and gave further credit to Mrs. Carter, from which further credit they suffered loss. Conceding that the trustee had no power to cancel the mortgage, to destroy the trust property for the benefit of his wife and her creditors, the claim is not that he canceled the mortgage, but that he represented that the mortgage had been canceled or had been paid. Undoubtedly Mr. Carter had power to collect the mortgage, and the mortgage was overdue. Assuming that a trustee, in this situation, can bind himself and his *cestuis que trust* by representing that a trust mortgage has been paid, and producing it and receipting it for cancellation, we have a case of estoppel, which can be invoked only so far as someone has been injured. In order to establish this estoppel, it must appear, not that Mr. Carter canceled the mortgage, or promised to cancel the mortgage, or declared his willingness or ability to cancel the mortgage, but that he represented to these defendants that the trust mortgage had been paid—*i. e.,* that he had received cash or property in lawful satisfaction of this mortgage for $3,000; and it must further appear that the defendants believed this representation, and had a right to believe it, and acted upon it, to their loss. These things being true, the mortgage is deemed canceled, but only to the extent necessary to indemnify the defendants against their loss. This is the familiar law of estoppel.

It is proved that Mr. Carter endeavored to explain to Mr. Hooley the whole transaction which resulted in the assignment to the children, and Mr. Hooley had ample opportunity to learn the facts. He had notice of the facts. The assignment, with its covenant of amount due, was exhibited and delivered to him. Mr. Carter probably stated that the mortgage debt had been paid to Miss Man. He may have said that the mortgage had, at that time, been canceled or discharged. Mr. Hooley cannot complain of any such truthful statement, when the other facts were submitted to him. When very skillfully cross-examined, Mr. Carter, in answer to the leading question whether he did not tell Mr. Hooley that the mortgage "had been paid," answered, "Yes," and being further questioned, said that he did

Carter *v.* Carter.

not mean "paid at the beginning." The witness seemed to be speaking of the interview of January 10th, but I think that this is a mistake, which further questioning would have corrected. The defendants' answer and cross-bill distinctly allege that Mr. Hooley distinctly testifies that the representation complained of was made on January 11th. My conclusion is that whatever was said by Mr. Carter as to the payment, or, as Mr. Hooley testifies, the cancellation of the mortgage, related either to the original payment to Miss Man (which, in view of the facts, of which Mr. Hooley had notice, was an immaterial matter), or to the unlawful cancellation which Mr. Carter offered and attempted to effect.

It is hardly credible that Mr. Carter, on January 11th, would have represented that he had been paid the mortgage debt which was due him as trustee, or if he did so represent, that Mr. Hooley would have believed, or would have had a right to believe, such a statement. The mortgage, in fact, was uncanceled and in the possession of the trustee mortgagee. It had been recently recorded. The owner of the mortgaged land, who, apparently, was the only person interested in procuring the payment of the mortgage, was practically insolvent, as was also her husband, as Mr. Hooley well knew. Moreover, the trustee was vindicating himself against charges and complaints of his creditor which impeached the fairness of the mortgage as it then stood before them. Mr. Hooley, according to his own testimony, with the papers before him, made no inquiry as to the time or manner of this payment. He would not naturally have been ready to accept the bare statement of the trustee that the mortgage had been paid, if, indeed, he had a right to accept such statement without any inquiry on his part. The mortgage, after being receipted, was not delivered to Mr. Hooley in order that it might be canceled of record, but was to be kept by Mr. Hooley in his safe. The parties do not seem to have contemplated the cancellation of the record, unless the interests of the defendants require such cancellation. Subject to the protection which the possession of the receipted mortgage gave to the defendants' claim against Mrs. Carter, both parties apparently contemplated the continuance of the mortgage as a lien, and Mr. Carter testi-

fied, and his testimony is not in any way contradicted, that Mr. Hooley assured him that Mrs. Carter would not be further troubled about the mortgage.

Upon Mr. Hooley's meagre testimony, the safe conclusion is that any statement of Mr. Carter about the cancellation of the mortgage related to the original discharge by Miss Man, or to the discharge which Mr. Carter undertook to effect, and that Mr. Hooley retained the receipted mortgage—the record remaining uncanceled—only for the benefit of his firm, well knowing that the mortgage had not been paid to the trustee, and therefore was to be preserved, unless the interests of his firm required its cancellation.

I shall not deal in detail with the testimony as to the other necessary elements of an estoppel. It does not satisfy me that, in reliance upon the alleged payment of the mortgage debt to the trustee (rather than an unlawful cancellation of the mortgage by the trustee), the defendants gave further credit to Mrs. Carter—refrained from closing her account by sale of her stocks. Most stock brokers, under the circumstances, would have been guided solely by their own interests in selling or keeping the securities which were pledged for Mrs. Carter's account. Mr. Hooley does not say that, upon the strength of the statement that the mortgage had been paid, the sale was delayed. His statement is that if the mortgage had not been delivered to him he thinks the account would have been closed right up, for the purpose of showing that the defendants felt that Mr. Carter was looking out for himself, and that they proposed to look out for themselves. This is not proof that the sale was delayed in reliance upon the false statement that the mortgage had been paid to the trustee; it may be some evidence that the sale was delayed in reliance upon the unauthorized cancellation of the mortgage by Mr. Carter.

Nor is it, perhaps, entirely plain that, by delaying the sale, a greater loss was incurred. Mr. Hooley states, in substance, that the market value of the securities declined after January 11th, 1900, and consequently they sold for less money. This testimony is a general conclusion of the witness based upon his recollection of the market. The exact facts, apparently, were obtainable, and

the witness might have come prepared to give definite evidence, not only of the loss, but of the amount thereof. When asked to state the difference between what the account would have realized if closed in January and the amount actually received, Mr. Hooley stated that it was impossible for him to do so, because he did not have "any recollection of the prices in January," and he could not, on the stand, "guess at" the difference.

With the burden of proof upon the defendants, in my judgment they fail to establish an estoppel for the benefit of their alleged additional loss on Mrs. Carter's account incurred by reason of a decline in value of the securities after January 11th, 1900.

The decree will establish the complainant's mortgage as an encumbrance prior to the defendants' judgment.